**VIRGINIA:  IN THE CIRCUIT COURT FOR THE CITY OF WILLIAMSBURG**
**AND COUNTY OF JAMES CITY**

**JOHN M. LOVELADY,**

**and**

**BEVERLY C. LOVELADY,**

           **Plaintiffs,**

**v.**
                      Case No. CL18000090-00

**FIVE STAR QUALITY CARE-VA, LLC,**

    *Serve: Registered Agent, Corporation Service Company*
         *Bank of America Center, 16th Floor*
         *1111 East Main Street*
         *Richmond, VA 23219*
         *(City of Richmond)*

           **Defendant.**

FILED
MONA A. FOLEY
CLERK CIRCUIT COURT
2018 JAN 16  PM 3: 02
CITY OF WILLIAMSBURG
COUNTY OF JAMES CITY
BY_____ D.C.

## COMPLAINT

    COME NOW the plaintiffs, John M. Lovelady ("Mr. Lovelady") and Beverly C. Lovelady ("Mrs. Lovelady") (Mr. Lovelady and Mrs. Lovelady are together referred to herein as "Plaintiffs"), and for their *Complaint* against Five Star Quality Care-VA, LLC ("Defendant"), respectfully state the following:

## PARTIES

    1.    Mr. Lovelady is a natural person and a resident of the Commonwealth of Virginia and the County of James City.  Mr. Lovelady is seventy-nine years of age and suffers from Alzheimer's Disease.

    2.    Mrs. Lovelady is a natural person, *sui juris*, and a resident of the Commonwealth of Virginia and the County of James City.  Mrs. Lovelady is the spouse of Mr. Lovelady and is his attorney-in-fact.

ALL-STATE LEGAL®
EXHIBIT
A

3.     Defendant is a limited liability company organized under the laws of Delaware. Defendant does business as "Dominion Village at Williamsburg" at 4132 Longhill Road in the County of James City where it operates a Licensed Assisted Living Facility.

## NATURE OF THE CASE

4.     This is an action to recover damages incurred by the Plaintiffs as a result of Defendant's breach of contract and unlawful termination of Mr. Lovelady's Residency Agreement.

## FACTS

5.     Plaintiffs and Defendant executed a Residency Agreement.  A true and accurate copy of the Residency Agreement is attached hereto as **Exhibit 1**.

6.     The Residency Agreement provides that it would commence on December 20, 2016 and continue until terminated in accordance with Section Five (5).

7.     Section Five provides for termination of the Residency Agreement by Dominion Village only under the four (4) circumstances enumerated therein, specifically:

   i.     Mr. Lovelady's care needs exceeding what Dominion Village is licensed to provide;
   ii.    Mr. Lovelady's continued residence endangering his own or other residents' health, safety or welfare;
   iii.   The fee for Mr. Lovelady's residency not being paid when due with such failure continuing for at least ten days after receipt of a delinquency notice; or
   iv.    The failure of Mr. or Mrs. Lovelady to comply with the Residency Agreement or the rules and policies in the Resident Handbook.

8.     Contemporaneously with the execution of the Residency Agreement, Defendant: required Plaintiffs to execute an *Acknowledgement of Receipt of the Five Star Quality Care Discharge Move Out Criteria*; and, furnished to Plaintiffs the *Resident Move-Out (Discharge) Criteria* (the "Discharge Criteria") attached hereto as **Exhibit 2**.

*Complaint – Lovelady*

9.    On August 8, 2017, Defendant egregiously breached the Residency Agreement by unilaterally terminating the Residency Agreement and discharging Mr. Lovelady without any legal basis or cause to do so.

10.    Mr. and Mrs. Lovelady abided by the Residency Agreement and the rules and policies in the Resident Handbook and paid all fees in a timely manner.  Mr. Lovelady's care needs never exceeded the services that Defendant was authorized and licensed to provide, and Mr. Lovelady's residency never endangered the health, safety or welfare of anyone.

11.    No reason, cause, excuse, ground or justification existed under the Residency Agreement or Discharge Criteria to terminate or discharge Mr. Lovelady.

12.    Rather, Defendant terminated the Residency Agreement and discharged Mr. Lovelady because its Executive Director Deirdre Lund disliked Mrs. Lovelady's advocacy, on behalf of Mr. Lovelady (who suffers from Alzheimer's Disease) and other residents, for minimum standards of cleanliness, hygiene and care.

13.    The Board of Social Services' Standards for Licensed Assisted Living Facilities, codified at 22 VAC 40-72-540, expressly provide (emphasis added):

> The resident has the right to voice or file grievances, or both, with the facility and to make recommendations for changes in the policies and services of the facility. **The residents shall be protected by the licensee or administrator, or both, from any form of coercion, discrimination, threats, or reprisal for having voiced or filed such grievances.**

14.    Instead of protecting Mr. Lovelady from reprisal for his agent's recommendations for improvements, Defendant breached the Residency Agreement by unilaterally terminating the Residency Agreement and discharging Mr. Lovelady from the facility.

*Complaint – Lovelady*

15.     The Defendant's breach of the Residency Agreement was a breach of contract, and Plaintiffs have suffered damages and continue to suffer damages as a direct result of Defendant's breach of contract.  Accordingly, Plaintiffs are entitled to recover compensatory damages.

16.     In addition, Defendant's discharge of Mr. Lovelady from the facility was in retaliation for Plaintiffs' exercise of the rights guaranteed to them by 22 VAC 40-72-540; and, was malicious and oppressive and unlawful; and, was intentional misconduct undertaken with an intentional disregard for the Plaintiffs' rights.  Accordingly, Plaintiffs are entitled to recover punitive damages.

### Prayer for Relief and Jury Demand

THEREFORE, your Plaintiffs respectfully pray that this Court enter an order or orders:

(i).    Granting judgment against Defendant in favor of Plaintiffs for compensatory damages in the amount of $344,194.00, with interest at the legal rate plus costs incurred herein; and

(ii).   Granting judgment against Defendant in favor of Plaintiffs for punitive damages in the amount of $350,000.00

(iii).  Granting such other and further relief as the Court deems appropriate.

### TRIAL BY JURY IS HEREBY DEMANDED

Respectfully submitted,

**JOHN M. LOVELADY and**
**BEVERLY C. LOVELADY**

By: _____
     Of Counsel

Daniel R. Quarles, Esq.
Virginia State Bar #40412
Otey Smith & Quarles
485 McLaws Circle

*Complaint – Lovelady*

Williamsburg, Virginia 23185
Telephone:      (757) 903-2665
Facsimile:      (757) 903-2664
Email:          dquarles@osqlaw.com
*Counsel for the Plaintiffs*

# Five Star Quality Care

# Residency Agreement

EXHIBIT

*Virginia*

*June 2010*

RESIDENCY AGREEMENT
TABLE OF CONTENTS

*Section*                                                                                                    *Page*

1.  Accommodations .................................................................................................. 3
    (a)  *The Residence; Furnishing and Decoration* ............................................. 3
    (b)  *Access to Your Residence* ............................................................................ 3
    (c)  *Access to Common Areas* ............................................................................ 4
    (d)  *Quiet Enjoyment by Other Residents* ...................................................... 4
    (e)  *Residence Relocation* .................................................................................. 4

2.  Our Services ....................................................................................................... 4
    (a)  *Basic Services* ............................................................................................... 4
    (b)  *Personal Care Services* ............................................................................... 4
    (c)  *Health Care Provider Notification and Arrangement of Services* ......... 5
    (d)  *Private Duty Personnel* .............................................................................. 5
    (e)  *Personal Expenditures and Needs Allowance* ........................................ 5

3.  Resident Rights and Rules ............................................................................... 5
    (1)  *Resident Handbook* ..................................................................................... 5
    (b)  *Resident Rights* ............................................................................................ 6
    (c)  *Residence Hold* ............................................................................................ 6

4.  Fees ..................................................................................................................... 6
    (a)  *Monthly Charges* .......................................................................................... 6
    (b)  *Fee Calculation* ............................................................................................ 6
    (c)  *Changes in Occupancy* ................................................................................ 7
    (d)  *Changes in Our Fee Schedules* .................................................................. 7
    (e)  *Changes in Personal Care Services* ........................................................... 7
    (f)  *Community Fee* ............................................................................................. 7
    (g)  *Optional Service Fees* .................................................................................. 7
    (h)  *Late Fees; Return Check Charges* ............................................................. 7
    (i)  *Fees for Collecting Outstanding Bills* ....................................................... 8

5.  Term and Early Termination ........................................................................... 8
    (a)  *Term* ............................................................................................................... 8
    (b)  *Early Termination by Us* ............................................................................ 8
    (c)  *Early Termination by You* .......................................................................... 8
    (d)  *Termination on Death* ................................................................................ 9

6.  Rights and Obligations on Termination ......................................................... 9
    (a)  *Right to Show Residence* ............................................................................ 9
    (b)  *Fees Due on Termination* ........................................................................... 9
    (c)  *Refunds* .......................................................................................................... 9
    (d)  *Removal of Personal Property* ................................................................... 9

7.  State Required Provisions ................................................................................. 9
    (a)  *Acknowledgements* ...................................................................................... 9

# RESIDENCY AGREEMENT
## TABLE OF CONTENTS–CONTINUED

*Section*                                                                                                 *Page*

8.   Miscellaneous Provisions ........................................................................................ 10

    *(a)   Non-Discrimination* .................................................................................. *10*

    *(b)   Visitors* .................................................................................................... *10*

    *(c)   Construction and Interpretation of this Agreement* ................................... *10*

    *(d)   Insurance* ................................................................................................. *11*

    *(e)   Ownership and Management Rights* ........................................................... *11*

    *(f)   Conservator or Guardian* ........................................................................ *11*

    *(g)   Assignability* ............................................................................................ *11*

    *(h)   Entire Agreement* ..................................................................................... *11*

    *(i)   Subordination* .......................................................................................... *11*

    *(j)   Notices and Consent* ................................................................................. *12*

    *(k)   Responsible Person* .................................................................................. *12*

## ATTACHMENTS

*Description*                                                                                    *Attachment*

Basic Services Offered ................................................................................................ A

Resident Rights ........................................................................................................... B

Services and Schedule of Rates ................................................................................... C

## RESIDENCY AGREEMENT SIGNATURE PAGE

Community: Dominion Village At Williamsburg

Address: 4132 Longhill Rd. Williamsburg VA, 23188

Resident: John Lovelady

N/A

Responsible Person or Persons: Beverly Lovelady

Location of Residence: 9B          Date of Occupancy: 12/20/2016

Service Level: BTR level 4 and simple med fee

| | | | | |
|---|---|---|---|---|
| Basic Services Rate: | $ 2900 | | Community Fee: | $ 1300 |
| Level of Care Rate: | $ 1365 | | | |
| Additional Resident Fee: | $ 55 | | | |
| Level of Care Rate for Additional Resident: | $ | | Initial Fees, Paid Through 1/18/2016 | $ |
| Total Monthly Rate: | $ 4,320 | | Total Fees due on Move In: | $ 5,620 |

Having read this Agreement and each of the attachments that follow this signature page (the "Attachments"), all of which are incorporated by this reference as if fully set forth above the following signatures, the undersigned acknowledge that they understand the rights and obligations created by this Agreement and its Attachments and, by signing below, agree to all of the terms and conditions contained in this Agreement and its Attachments.

Dominion Village At Williamsburg

By: _Deidre Crel_

Title: _Exu. Dir_

Date: _12/20/16_

_Beverly C. Lovelady POA_
Signature of John Lovelady
Date: _12/21/16_

Signature of N/A
Date: _____

Signature of Beverly Lovelady _Beverly C. Lovelady_
Date: _12/21/16_
Initial:

Signature of
Date: _____

[✓] You acknowledge you have received a copy of the Resident Handbook.

[✓] You acknowledge that you have signed a separate Arbitration Agreement.

## RESIDENCY AGREEMENT
## SIGNATURE PAGE FOR FINANCIALLY RESPONSIBLE PERSON

Having read this Agreement and each of the attachments that follow this signature page (the "Attachments"), all of which are incorporated by this reference as if fully set forth above the following signatures, the undersigned acknowledge that they understand the rights and obligations created by this Agreement and its Attachments and, by signing below, agree to all of the terms and conditions contained in this Agreement and its Attachments, as it may be amended from time to time in accordance with its terms.

If the resident fails to pay the Community any fees and charges of any kind, the undersigned agree to pay the Community all amounts due from the resident under this Agreement, as it may be amended from time to time, including any amounts resulting from an increase in fees or charges authorized by the Agreement.  The undersigned further acknowledge and agree that their obligations arising under this Agreement will not be discharged, impaired or otherwise affected by any waiver, extension or release by the Community of obligation or responsibility of Resident arising under this Agreement. As the Financially Responsible Person the undersigned agree to pay the Community within 20 days of receiving notice from the Community of nonpayment by the resident.

_Beverly C. Lovelady POA_
Signature of

_12/21/16_
Date

_Beverly C. Lovelady_
Signature of Beverly Lovelady

_12/21/16_
Date

# RESIDENCY AGREEMENT

The Resident, their Responsible Person or Persons and Financially Responsible Person or Persons listed on the signature pages of this Agreement, if applicable, are referred to collectively in this Agreement as "you". This Agreement describes your and the Community's mutual rights and obligations related to your occupancy of the Residence identified on Page 1 of this Agreement (the "Residence") and the services that we will be providing you while you reside in the Community.

### 1. ACCOMMODATIONS.

*(a) The Residence; Furnishing and Decoration.*

(1) You may move into your Residence on or after the Date of Occupancy listed on Page 1 of this Agreement. You acknowledge that you have had an opportunity to inspect the Residence and that its condition and state of repair meets with your approval. You will use the Residence as your private residence and will maintain it in a clean, sanitary and orderly condition.

(2) You may personalize and decorate your Residence by providing your own furnishings and belongings, provided that you do not create a safety hazard or otherwise violate any rules of the Community. You may not make, however, any structural or physical changes to your Residence without obtaining the Community's Executive Director's prior consent. Once approved, you may make the changes or alterations that the Executive Director has approved and those changes and alterations become the Community's property. For your safety and that of others in the Community, however, you may not change or add locks to any door, window or cabinet in the Residence.

*(b) Access to Your Residence.*

(1) We will grant access to your Residence only to those persons you have designated. If you have repair or other service providers entering your Residence while you are away, you need to notify us prior to the scheduled visit.

(2) Although you have a right to your privacy in the Residence, we may enter the Residence upon reasonable notice and during reasonable hours to clean, inspect, repair, alter or conduct maintenance that we may determine necessary for the reasonable care of the Residence and perform other management functions as we deem necessary and advisable. Government agencies may require us to grant their agents access to your Residence for the purpose of inspecting, without your consent. Whenever feasible, we will give you reasonable notice before any of our representatives or agents or those of government agencies enter the Residence.

(c) *Access to Common Areas.* While you are a resident in the Community, you will have the right to use our general purpose rooms such as lounges, craft rooms, library, private dining rooms, and the grounds surrounding the Community, including the parking lot, in accordance with the limitations set forth in the Community's Resident Handbook, its rules and state regulations.

(d) *Quiet Enjoyment by Other Residents.* While you remain a resident in the Community, you will not act in any manner that will interfere with our other residents' quiet enjoyment of the Community. If you or any of your visitors damage any of our furnishings or fixtures beyond normal wear and tear, you will reimburse us for the cost of its repair or replacement.

(e) *Residence Relocation.* A request by you for a Residence relocation will be granted at our discretion. If you move to a Residence that has a different monthly rate than your Residence, you will responsible for payment of the new monthly rate. If you move pursuant to your own request, you will be responsible for all costs associated with the move, including the cost to clean and redecorate the Residence you are vacating and preparing the new Residence for occupancy by you. We may need to substitute your Residence with another Residence to comply with any applicable law or any order of any court or government agency, or for any other reasonable purpose, including your relocation to an area that would facilitate any needed or required observation or supervision. If we must relocate you to another Residence, we will make every reasonable effort to provide you with a reasonably comparable Residence.

## 2. OUR SERVICES.

(a) *Basic Services.* While you are a Resident in the Community, we will provide you with three meals per day, planned activities with other residents of the Community, light housekeeping services for your Residence, weekly linen service and an emergency call system, in the manner and to the extent described on Attachment A, Basic Services Offered (the "Basic Services").

(b) *Personal Care Services.* In addition to the Basic Services, we will provide you with personal care services designed to supplement and assist your normal activities of daily living ("Level of Care"). Prior to the date of this Agreement, we have assessed your personal care needs and have developed a program of care that addresses those needs. During the first 30 days of your stay with us, we will complete a reassessment to verify that we are providing you with the personal care services appropriate for your needs. Thereafter, no less often than ___Quarterly,___ we will perform an evaluation of your needs to determine whether your condition has changed. If we determine that the personal care services we are providing you are not appropriate for your needs, we will consult with you and implement a change in the services we are providing. We will also inform your Responsible Person of the change.

*(c) Health Care Provider Notification and Arrangement of Services.* You have authorized us, pursuant to a separate medical authorization for the use and disclosure of health information, to contact specified individuals and health care providers (your "Concerned Parties") (1) if we determine it is necessary to advise your Concerned Parties of your situation, (2) to arrange for health care services and other assistance needed by you, or (3) if you have a life-threatening emergency you authorize us to contact an emergency rescue service in addition to your Concerned Parties. If your Concerned Parties are unavailable, you authorize us to arrange for the services of other health care providers.

*(d) Private Duty Personnel.*

*(1)* To the extent you need services that we offer, you must obtain those services from us. Although you have the freedom of choosing your personal care provider for those services not offered by us, you cannot hire any of our employees as private duty personnel while in our employ and for three months after being employed by us. Before we will permit any private duty personnel that you have employed into the Community, you must provide the Executive Director with the name of the private duty personnel, his or her employer, if any, and a background check reasonably satisfactory to us.

*(2)* All private duty personnel hired by you must comply with all of our policies and procedures. If any of the private duty personnel fails to comply, we will deny such person access to our premises. You agree to be financially responsible for any charges from private duty personnel. You understand that private duty personnel employed by you are not employees of ours; they are not covered by our liability or Worker's Compensation insurance, nor are they entitled to any of our benefits.

*(3)* If we determine that you are a wander risk or are engaging in a behavior that poses a potential threat to your safety or the safety of others, we reserve the right to retain 24-hour private duty personnel to provide care appropriate to your needs and you agree to be responsible for the costs for such personnel.

*(e) Personal Expenditures and Needs Allowance.* We will not manage or hold any of your personal funds and will not provide you with any assistance in managing your personal funds during your stay at the Community. You will be responsible for holding and managing any funds you desire for personal expenditures during your stay at the Community.

3. RESIDENT RIGHTS AND RULES.

*(1) Resident Handbook.* You will observe and abide by the rules and policies set forth in the Resident Handbook, a copy of which is included with your move-in package. We reserve the right to change or otherwise modify the Resident Handbook from time to time during your stay in the Community. If we do so, we will provide you with a

copy of the revised Resident Handbook. If we determine that you are not complying with the Resident Handbook, we will ask you to discontinue the behavior that we believe violates the Resident Handbook. By signing this Agreement, you acknowledge that you have received and reviewed a copy of the Resident Handbook and agree to abide by its terms as it may change from time to time during your stay with us. You further acknowledge that we have informed you of our policies regarding weapons, smoking and administration and storage of medication and dietary supplements, all of which are described in detail in the Resident Handbook. Additionally, you acknowledge that you understand the general purpose of a residents' council and that you and other interested residents may establish and maintain a resident council, and we are responsible for providing assistance with the formation and maintenance of the council, whether such a council currently exists, and the general purposes of a resident council.

(b) *Resident Rights.* As a resident of our Community, you have the rights set forth on Attachment B. By signing this Agreement you acknowledge receipt of a copy of the Rights and Responsibilities of Residents of Assisted Living Facilities. You also acknowledge that these rights and our policies and procedures for implementing these rights have been explained to you, including the grievance policy and the transfer and discharge policy.

(c) *Residence Hold.* If you are not physically present in the Residence due to voluntary leaves of absence or for temporary care needed at another facility, we agree to hold your Residence as long as you pay all fees due under this Agreement. We will not rent your Residence to another person without giving proper notice in accordance with this Agreement or until such time as you notify us that you are not returning to the Community. You will continue to be responsible for all fees due under this Agreement until the later of (1) 30 days after we received notice that you are not returning to the Community or (2) the date all of your personal belongings have been removed from the Residence.

4. FEES.

(a) *Monthly Charges.* Your initial monthly rate for Basic Services and Accommodations, and Level of Care are set forth on page 1 of this Agreement. The charges for Level of Care and additional services that we offer are set forth on Attachment C. We will bill you monthly in advance for these charges and payment should be made pursuant to procedures set forth on the statement.

(b) *Fee Calculation.* We calculate all fees on a monthly basis. Fees are not adjusted for any days that you are absent from the Community, such as when you are on vacation or visiting family or friends or if you are admitted for a brief stay at a nursing home, hospital or other health care facility. If you are away from the Community for more than ___10___ consecutive days, charges for Level of Care will be temporarily discon-

*Virginia*                                              -6-                                    *June 2010*

tinued for each day you are absent from the Community in excess of __10__ days. If this Agreement becomes effective on a day other than the first day of the month, the total Monthly Fees will be prorated on a daily basis.

(c) *Changes in Occupancy.* If the Residence is occupied by two persons and one surrenders the Residence to the other, the remaining Resident's obligation under this Agreement will continue in full legal force and effect, and the monthly fee will be adjusted to reflect the single occupancy rate then in effect for the Residence. If the remaining resident wishes to transfer to a single Residence, he or she may do so when one becomes available.

(d) *Changes in Our Fee Schedules.* We reserve the right to change the rates that we charge you for rent and services that we provide you from time to time during the term of this Agreement. Any change in our fee schedule listed on Attachment C, styled "Services and Schedule of Rates", will be effective 30 days after we notify you of the change. You understand and agree that such notice will constitute an amendment to this Agreement.

(e) *Changes in Personal Care Services.* The initial Level of Care Rate referenced on page 1 of this Agreement is based on our initial assessment of your needs prior to the Date of Occupancy. If a reassessment of your needs indicates that the level of care we are providing you is not appropriate for your needs, your fees for personal care services may increase or decrease. You will be notified of any changes in your personal care services and Level of Care Rate. The new fee will be effective immediately upon notification.

(f) *Community Fee.* In addition to the fees described elsewhere in this Agreement, you will owe us on the Date of Occupancy, the Community Fee listed on page 1. This fee is not a security deposit and is non-refundable. The fee covers the Community's costs related to admission, Residence preparation, orientation and initial needs assessment, as well as general costs associated with the up keep of the Community.

(g) *Optional Service Fees.* If you have requested any of the optional or alá carte services listed on Attachment C to this Agreement or in the Resident Handbook, you agree to pay the fees associated with such services. We reserve the right to change those fees from time to time during your stay with us. Any change in our fee schedule for optional or alá carte Services will be effective 30 days after we notify you of the change.

(h) *Late Fees; Return Check Charges.* All our fees are due and payable on the due date on the invoice. Payment should be made pursuant to the procedures set forth on the invoice. If you fail to pay our fees when due, we will assess you a late charge of $ 50.00 _____. If your check is not honored for payment, we will assess a bank service fee of $25 in addition to any late fees that are assessed.

(i) *Fees for Collecting Outstanding Bills.* If we are required to bring any action to collect any fees due from you under this Agreement to us, you will pay us, in addition to all the fees due us, all of the costs we incur to collect such fees, including costs and fees of collection agencies and attorneys used by the Community and courts or other governmental agencies' fees, to the fullest extent permitted by law.

5. TERM AND EARLY TERMINATION.

(a) *Term.* This Agreement will become effective on the Date of Occupancy and will continue until terminated as provided in this Section 5 of the Agreement.

(b) *Early Termination by Us.*

(1) If we determine at any time during your stay with us that your care needs exceed what we are authorized by our license to provide, we will notify you. You will make arrangements for you to move out of the Community as soon as reasonably possible. We will assist you in locating a place that is able to provide care commensurate with your needs. This Agreement will terminate on the date that you vacate the Residence and remove all your personal belongings.

(2) We may terminate this Agreement and your right to continue to live in the Community immediately upon notice to you if we believe that your continued residence at the Community endangers your or our other residents' health, safety or welfare, including violating our policy on weapons and firearms.

(3) We may terminate this Agreement at any time and for any reason by delivering to you a notice of termination at least 14 days prior to the date of termination set forth in our notice. Reasons for termination may include the following and will be discussed with you and your Responsible Person:

(A) You fail to pay any fee due us when due and such failure continues for at least 10 days following your receipt of a delinquency notice from us; or

(B) You fail to comply with the terms of this Agreement or the general rules and policies of the Community as outlined in the Resident Handbook or otherwise made available to the residents.

(c) *Early Termination by You.* You may terminate this Agreement in accordance with Section 3(c) at any time and for any reason by delivering to us a notice of termination at least 30 days prior to the date of termination included in your notice.

(d) *Termination on Death*. This Agreement will terminate automatically on the later of (1) 30 days after the date of your death, or (2) the date all of your personal belongings have been removed from the Residence.

6. RIGHTS AND OBLIGATIONS ON TERMINATION.

(a) *Right to Show Residence*. From and after the date of delivery of the notice of termination, we may show the Residence to prospective residents upon reasonable notice to you and during reasonable hours.

(b) *Fees Due on Termination*. You will be responsible for all fees up through the later of (1) the date this Agreement terminates or the date you surrender the Residence to us empty of all your personal property, or (2) if you terminate this Agreement pursuant to Section 5(c) and you fail to provide us with at least 30 days of notice, you will be responsible for all fees for services and accommodations, at the daily rate you were being charged as of the date you notified us, for each day between the date you surrendered the Residence to us and 30 days following date we received your notice of termination.

(c) *Refunds*. If you have pre-paid any fees or charges, upon termination of this Agreement, we will refund to you or your Responsible Person any excess due to you in accordance with state regulations within 60 days. All periodic fees will be prorated by the number of applicable days through the termination date. (1)    If we close the Community, we will refund to you any fees paid by you that relate to periods following the date of closure within 60 days prior to the date you vacate the Community. If we transfer ownership of the Community, any fees paid by you that relate to periods following the date of transfer will be remitted to the new owner and credited to your account with that new owner.

(d) *Removal of Personal Property*. If you fail to remove your personal property from the Residence on or before the termination date, or within 10 days after your death, we may elect to remove your personal property from the Residence and place it in storage at your or your estate's expense.

7. STATE REQUIRED PROVISIONS.

(a) *Acknowledgements*. By signing this Residency Agreement, you acknowledge that we have informed you of our policies regarding the amount of notice that you must give us if you wish to move out of the Community, and bed hold policy in case of temporary transfer and that you have received written assurance that the facility has the appropriate license to meet your care needs at the time of move in.

8. MISCELLANEOUS PROVISIONS.

(a) *Non-Discrimination.* Your race, color, sex, religious beliefs, national origin and disability status do not have any bearing upon your acceptance or rejection for admission, transfer, the execution of this Agreement, or the normal conduct of business by the Community. If you experience any acts of discrimination by staff or other residents at the Community, they should be reported immediately to Community's supervisory personnel for appropriate investigation.

(b) *Visitors.* Your visitors are welcome and encouraged any time provided they respect the rights of other residents and staff and abide by the policies set forth in the Resident Handbook. Before any visitor may stay in your Residence overnight, you must notify the Community's Executive Director. We reserve the right to refuse entry to (1) persons whose actions may be disruptive to other residents, (2) persons whose actions may threaten the safety of any resident or employee, or (3) persons whose presence we reasonably believe could result in liability to us.

(c) *Construction and Interpretation of this Agreement.*

(1) Section titles or captions in this Agreement are included for purposes of convenience only and should not be considered a part of the Agreement in construing or interpreting any of its provisions. All references in this Agreement to Sections shall refer to Sections of this Agreement unless the context clearly otherwise requires.

(2) When used in this Agreement, the word "including" has its normal common meaning and any list of items that may follow such word should not be deemed to represent a complete list of the contents of the referent of the subject.

(3) If any ambiguity or question of intent or interpretation arises, no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

(4) Unless the context otherwise requires, when used in this Agreement, the singular includes the plural, the plural includes the singular, and all nouns, pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, as the identity of the person or persons may require.

(5) If a court holds any provision of this Agreement or the application to any circumstance or person to be invalid or unenforceable, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid or unenforceable will not be affected.

(6) Our failure in one or more instances to insist upon the strict performance, observance or compliance by you with any of the terms and provisions of this Agreement shall not be construed to be a waiver or relinquishment by us of our right to insist upon strict compliance by you with all the terms and provisions of this Agreement. Acceptance of payment from you after we have provided you with a notice of termination in accordance with our rights described in Section 5(b) of this Agreement will not constitute a waiver of our right to terminate this Agreement.

(d) *Insurance*. You are responsible for insuring any personal property that you may keep in the Residence and for any liability insurance for you or your visitors. We will not be responsible for any damage, loss or injury to your property or visitors caused by theft, fire, water or other casualty.

(e) *Ownership and Management Rights*. You have no ownership rights to or interest in the Residence, our personal property, the land, buildings and other improvements located at the Community. This Agreement is not a lease nor does it confer on you any right of tenancy or ownership. We reserve the right to manage the Community in a manner that is in the best interests of all of our residents.

(f) *Conservator or Guardian*. If you become legally incompetent or are unable to care for yourself or your property properly and have failed to designate a person to serve as your guardian or conservator, you grant us the authority to apply on your behalf to a court for the appointment of a conservator or guardian. In no event will we seek to act in such capacity.

(g) *Assignability*. You may not assign or sublet any of your rights under this Agreement. In connection with the transfer of our interest in the Community, we may assign all of our rights and obligations under this Agreement to an assignee who agrees to assume the obligations arising under this Agreement. Upon such an assignment, we will be released from all further obligations arising under this Agreement and you agree to look solely to the assignee for enforcement of any of your rights under this Agreement on and after the effective date of such assignment.

(h) *Entire Agreement*. All Attachments and other documents referenced in this Agreement are incorporated in this Agreement and constitute a part of it. This Agreement and all of the Attachments and documents referenced in this Agreement constitute the entire agreement between you and us regarding your residency and supercedes all prior agreements regarding your residency.

(i) *Subordination*. Your rights under this Agreement are subordinate to any mortgage or security instrument secured by the Community's assets.

*(j) Notices and Consent.* All notices, consents or waivers must be in writing. We will send our notices to you at your Residence with a copy to your Responsible Person, if applicable. You will send your notices to us at the Community's address to the attention of the Community's Executive Director. Notices may be (1) hand delivered, (2) sent by Certified Mail, Return Receipt Requested or (3) sent by a nationally recognized overnight courier service. Notices will not be deemed delivered until (1) actual receipt by the recipient, if hand delivered, (2) the first business day following delivery to nationally recognized overnight courier service, or (3) the third business day following the date of deposit in the U.S. Mail.

*(k) Responsible Person.* By signing this Agreement your Responsible Person has unconditionally guaranteed all of your obligations under this Agreement. If you fail to pay us any amount when due, we can bill and expect payment from your Responsible Person.

## ATTACHMENT A — BASIC SERVICES OFFERED

*Meals and Snacks*
Three nutritionally well-balanced meals per day are included in the Basic Services Rate. If modified dietary needs are required, there may be extra charges as outlined in Attachment C.

*Activities*
The Community will provide its Healthy Generation[SM] Program of planned activities for resident participation designed to assist you in meeting your social, physical, intellectual, emotional and spiritual needs.

*Common Areas*
You will have the right to use the general-purpose rooms of the Community.

*Parking*
Parking for residents of the Community and visitors is available in designated areas as detailed in the Resident Handbook. There may be additional costs associated with parking at the Community, see Attachment C.

*Transportation*
There is scheduled transportation to medical and dental appointments, shopping and to planned social events as further described in the Resident Handbook. Other transportation arrangements may be made for an extra fee. All other transportation is your responsibility.

*Housekeeping Services*
The Community will provide light housekeeping services consisting of vacuuming, dusting cleared surfaces, trash removal, sanitizing the bathroom, external surface cleaning of the kitchen area and changing bed linens.

*Laundry Services*
The Community will provide linen services in accordance with state regulation and as detailed in the Resident Handbook. Personal laundry services are also available as outlined in the Resident Handbook and Attachment C.

*Emergency Call and Response System*
Each residence in the Community is equipped with an emergency response system.

## ATTACHMENT B — RESIDENT RIGHTS

## RIGHTS AND RESPONSIBILITIES OF
## RESIDENTS OF ASSISTED LIVING FACILITIES

**§ 63.2-1808. Rights and responsibilities of residents of assisted living facilities; certification of licensure.**

A. Any resident of an assisted living facility has the rights and responsibilities enumerated in this section. The operator or administrator of an assisted living facility shall establish written policies and procedures to ensure that, at the minimum, each person who becomes a resident of the assisted living facility:

1. Is fully informed, prior to or at the time of admission and during the resident's stay, of his rights and of all rules and expectations governing the resident's conduct, responsibilities, and the terms of the admission agreement; evidence of this shall be the resident's written acknowledgment of having been so informed, which shall be filed in his record;

2. Is fully informed, prior to or at the time of admission and during the resident's stay, of services available in the facility and of any related charges; this shall be reflected by the resident's signature on a current resident's agreement retained in the resident's file;

3. Unless a committee or conservator has been appointed, is free to manage his personal finances and funds regardless of source; is entitled to access to personal account statements reflecting financial transactions made on his behalf by the facility; and is given at least a quarterly accounting of financial transactions made on his behalf when a written delegation of responsibility to manage his financial affairs is made to the facility for any period of time in conformance with state law;

4. Is afforded confidential treatment of his personal affairs and records and may approve or refuse their release to any individual outside the facility except as otherwise provided in law and except in case of his transfer to another care-giving facility;

5. Is transferred or discharged only when provided with a statement of reasons, or for nonpayment for his stay, and is given reasonable advance notice; upon notice of discharge or upon giving reasonable advance notice of his desire to move, shall be afforded reasonable assistance to ensure an orderly transfer or discharge; such actions shall be documented in his record;

6. In the event a medical condition should arise while he is residing in the facility, is afforded the opportunity to participate in the planning of his program of care and medical treatment at the facility and the right to refuse treatment;

7. Is not required to perform services for the facility except as voluntarily contracted pursuant to a voluntary agreement for services that states the terms of consideration or remuneration and is documented in writing and retained in his record;

8. Is free to select health care services from reasonably available resources;

9. Is free to refuse to participate in human subject experimentation or to be party to research in which his identity may be ascertained;

10. Is free from mental, emotional, physical, sexual, and economic abuse or exploitation; is free from forced isolation, threats or other degrading or demeaning acts against him; and his known needs are not neglected or ignored by personnel of the facility; 

11. Is treated with courtesy, respect, and consideration as a person of worth, sensitivity, and dignity; 

12. Is encouraged, and informed of appropriate means as necessary, throughout the period of stay to exercise his rights as a resident and as a citizen; to this end, he is free to voice grievances and recommend changes in policies and services, free of coercion, discrimination, threats or reprisal; 

13. Is permitted to retain and use his personal clothing and possessions as space permits unless to do so would infringe upon rights of other residents;

14. Is encouraged to function at his highest mental, emotional, physical and social potential;

15. Is free of physical or mechanical restraint except in the following situations and with appropriate safeguards:

   a. As necessary for the facility to respond to unmanageable behavior in an emergency situation, which threatens the immediate safety of the resident or others;

   b. As medically necessary, as authorized in writing by a physician, to provide physical support to a weakened resident;

16. Is free of prescription drugs except where medically necessary, specifically prescribed, and supervised by the attending physician, physician assistant, or nurse practitioner;

17. Is accorded respect for ordinary privacy in every aspect of daily living,

including but not limited to the following:

   a. In the care of his personal needs except as assistance may be needed;

   b. In any medical examination or health-related consultations the resident may have at the facility;

   c. In communications, in writing or by telephone;

   d. During visitations with other persons;

   e. In the resident's room or portion thereof; residents shall be permitted to have guests or other residents in their rooms unless to do so would infringe upon the rights of other residents; staff may not enter a resident's room without making their presence known except in an emergency or in accordance with safety oversight requirements included in regulations of the Board;

   f. In visits with his spouse; if both are residents of the facility they are permitted but not required to share a room unless otherwise provided in the residents' agreements;

18. Is permitted to meet with and participate in activities of social, religious, and community groups at his discretion unless medically contraindicated as documented by his physician, physician assistant, or nurse practitioner in his medical record; and

19. Is fully informed, as evidenced by the written acknowledgment of the resident or his legal representative, prior to or at the time of admission and during his stay, that he should exercise whatever due diligence he deems necessary with respect to information on any sex offenders registered pursuant to Chapter 9 (§ 9.1-900 et. seq.) of Title 9.1, including how to obtain such information. Upon request, the assisted living facility shall assist the resident, prospective resident, or the legal representative of the resident or prospective resident in accessing this information and provide the resident, prospective resident, or the legal representative of the resident or prospective resident with printed copies of the requested information.

B. If the resident is unable to fully understand and exercise the rights and responsibilities contained in this section, the facility shall require that a responsible individual, of the resident's choice when possible, designated in writing in the resident's record, be made aware of each item in this section and the decisions that affect the resident or relate to specific items in this section; a resident shall be assumed capable of understanding and exercising these rights unless a physician determines otherwise and documents the reasons for such determination in the resident's record.

C. The rights and responsibilities of residents shall be printed in at least 12-point type and posted conspicuously in a public place in all assisted living facilities. The facility shall also post the name and telephone number of the regional licensing supervisor of the Department, the Adult Protective Services' toll-free telephone number, as well as the toll-free telephone number for the Virginia Long-Term Care Ombudsman Program, any sub-state ombudsman program serving the area, and the toll-free number of the Virginia Office for Protection and Advocacy.

D. The facility shall make its policies and procedures for implementing this section available and accessible to residents, relatives, agencies, and the general public.

E. The provisions of this section shall not be construed to restrict or abridge any right that any resident has under law.

F. Each facility shall provide appropriate staff training to implement each resident's rights included in this section.

G. The Board shall adopt regulations as necessary to carry out the full intent of this section.

H. It shall be the responsibility of the Commissioner to ensure that the provisions of this section are observed and implemented by assisted living facilities as a condition to the issuance, renewal, or continuation of the license required by this article.

(1984, c. 677, § 63.1-182.1; 1989, c. 271; 1990, c. 458; 1992, c. 356; 1993, cc. 957, 993; 1997, c. 801; 2000, c. 177; 2002, cc. 45, 572, 747; 2004, c. 855; 2006, 396; 2007, cc. 120, 163.)

## In Case of Questions or Concerns, You May Call:

Regional Licensing Administrator,
Virginia Department of Social Services:      Kendra Jennings

Telephone Number: _757-247-8030_____

Toll-Free Telephone Number for Adult Protective Services: 1-888-832-3858
(1-888-83ADULT)

Toll-Free Telephone Number for Virginia Long-Term Care Ombudsman Program:
1-800-552-3402

Local/Sub-State Ombudsman Program:      Carol Turner

Telephone Number: _757-220-1577_____

Toll-Free Telephone Number for the Virginia Office for Protection and Advocacy:
1-800-552-3962

## ATTACHMENT C — SERVICES AND SCHEDULE OF RATES

Insert or attach Services and Schedule of Rates here.



**FIVESTAR**
QUALITY CARE, INC

# RESIDENT MOVE-OUT
# (DISCHARGE) CRITERIA
# (VIRGINIA)

| | |
|---|---|
| Policy Number: | CL-AL-RS201VA |
| Policy Date: | 4/6/04 |
| Revision Date: | 11/14/05 |
| Policy Sponsor: | Clinical / Resident Services |

**DOCUMENTATION REQUIREMENTS**

See Section 4.0 below

## 1.0   PURPOSE

Provide consistent resident continued stay and move-out (discharge/transfer) criteria.

## 2.0   FUNDAMENTAL INFORMATION

The Community shall comply with Virginia licensure/regulatory requirements related to resident admission/retention/discharge.

## 3.0   PROCEDURE

### 3.1   REASONS FOR MOVE-OUT (DISCHARGE/RE-LOCATION) AND/OR TERMINATION OF AGREEMENT:

1. *Medical/Healthcare:*  Changes in the resident's physical, mental condition, services or care procedures that the Community cannot provide due to certification/licensure, design or staffing requirements (and the resident refuses to obtain outside services to meet these needs).  Such changes include, but is not limited to the following:

   - Resident requires *twenty four (24) hour, seven (7) day a week* skilled nursing care and supervision;

   - The resident has an *unstable* medical condition and/or health problem that cannot be managed in the assisted living environment;

   - Resident is *bedridden* for more than *14* consecutive days *and* a licensed H[ealth] Professional determines that the residents needs cannot be met by the Co[mmunity]

   - The presence of a *Stage III-IV* pressure ulcers *and* a licensed health profe[ssional] determines that the resident's care needs cannot be met by the Community[;]

   - The resident requires the *assistance of 2 or more staff* for transfers *and* a licensed

**EXHIBIT**

2

FIVESTAR
QUALITY CARE, INC.

- The resident has active Tuberculosis or communicable disease condition that is likely to be transmitted to other residents or staff; *and* requires more than contact isolation;

- The resident exhibits behavior problems, such as combativeness, aggressiveness or disruptive behavior, which threatens himself, other residents or staff;

- Medication regimes that include psychotropic medication do NOT have appropriate documented diagnoses and treatment plan from the resident's healthcare provider.

2. An immediate transfer/discharge as a result of a resident's urgent medical needs.

3. To protect the safety, health or welfare of the resident or others in the Community.

 4. Failure of the resident to abide by the Community rules and regulations, or state and local laws;

5. Violations of the resident agreement.

6. The resident demonstrates conduct that is disruptive or disturbing to other residents and such behaviors persist after notification to the resident to cease the behaviors.

7. The resident elects to relocate and gives notice to the Community.

## 3.2   CONTINUED RESIDENCY CRITERIA

If *Hospice* services are allowed by state regulations and an agreement has been signed between the Community and a licensed hospice agency:

- The resident must meet the criteria for services by a licensed hospice agency.

- The resident and/or representative and physician agree that the resident's physical needs can be met at the Community.

- An interdisciplinary plan of care must be developed and implemented by the hospice agency and approved by the RSD and Executive Director.

- The Community assures that all state and local fire-safety requirements can be met.

## 3.3   MOVE-OUT PROCESS AND DOCUMENTATION REQUIREMENTS

1. *Regardless* of the reason for move-out (transfer/discharge), the Community shall be responsible to assist the resident and/or responsible party in the placement process *and* develop a safe/appropriate discharge plan.

2. The resident and/or responsible party shall be notified in writing, at least *14* days in advance of move-out/termination of agreement.  The notice shall include, but is not limited to the following:

- Reason for transfer/discharge, including the events that were the basis for the action;

FiveStar
QUALITY CARE, INC.



- Effective date of the transfer;

- Notice of the resident's right to appeal the decision (in accordance with state regulations);

- Address/phone number of the Ombudsman and any other agency as required by regulations.

The 14-day written notice may be waived in the event of a health emergency or risk to the health or safety to others.  The RSD shall be responsible to notify the resident/responsible party within 24 hours of the need for immediate re-location to an appropriate care setting.

4. The RSD must be notified of all upcoming transfers and must ensure that the resident is receiving appropriate care prior to the transfer/move-out date.

## 4.0  DOCUMENTATION

1. The resident file documentation shall include:

    a. Time, date, location and mode of transfer;

    b. Resident condition, list of medications/treatments, date of recent PPD or CXR;

    c. Diagnosis, diet, resident's functional status, and skin condition.

2. The Community must provide the following information to the resident and/or receiving Community/agency (upon resident consent to release such information):

    a. Summary of resident stay/condition;

    b. List of medications, treatments;

    c. Copy of most recent physician health assessment and date of PPD/CXR;

    d. List of diagnoses, diet and allergies;

    e. Resident's current level of function for self-care.

## 5.0  RELATED COMPANY GUIDELINES

CL-AL-RS200          Resident Move-In (Admission) Criteria (VA)